B.E. WALLACE PRODUCTS
CORP., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Spanco, Inc., Third–Party Defendant.

No. 219–89C.

United States Claims Court.

May 29, 1992.

Michael F. Petock, Valley Forge, Pa., for plaintiff.

Robert Hilton, with whom were Asst. Atty. Gen. Stuart M. Gerson and Vito J. DiPietro, Director, Washington, D.C., for defendant. Barry A. Stein, Philadelphia, Pa., for third-party defendant, Spanco, Inc.

## OPINION

WILKES C. ROBINSON, Judge.

In this patent action filed pursuant to 28 U.S.C. § 1498 (1988), plaintiff, B.E. Wallace Products Corp. (Wallace) seeks compensation from the United States for the alleged unauthorized use of gantries manufactured by Spanco, Inc. (Spanco), Material Handling Systems, Inc. (MHS) and Motivation Industrial Equipment, Ltd. (Motivation) covered by claims 1, 2, 11 and 12 of U.S. Patent No. 4,041,875 (Wallace patent).[1] Prior to its filing of this suit, Wallace had filed an administrative claim against the Army seeking compensation for the use of infringing gantries supplied by MHS. The administrative claim was denied on the ground that the Wallace patent's claims were invalid. However, the Army's denial was silent as to whether the claims of the patent were actually infringed by the MHS gantry.

MHS and Motivation are not parties to this proceeding. However, the question of whether the gantries made by these two manufacturers infringe the Wallace patent is before the court pursuant to plaintiff's complaint and, therefore, will be considered and resolved. Of the three suppliers, third party defendant Spanco has supplied about 80% of the accused devices.[2] In this suit defendants do not challenge the validity of the patent-in-suit. They only contend that they are not liable under 28 U.S.C. § 1498(a) because the patent claims do not cover the gantries manufactured by any of the three suppliers.

Based on the record produced at trial, the court finds that plaintiff has not established by a preponderance of the evidence that any of the accused devices infringe the patent-in-suit. Our reasons follow.

### Factual Background

Defendant and Spanco admit that the accused gantries are, in fact, three-way adjustable gantries of the general type disclosed in the patent-in-suit. Further, Spanco admits that it specifically developed its accused gantries to compete with the Wallace gantries without infringing the patent-in-suit. Thus, Spanco does not dispute that it not only knew of the Wallace patent but, for competitive reasons, undertook to design a gantry having a true A-frame construction with the attributes of stability and simplicity that would not infringe the Wallace patent, but yet would have most of

---

1. Appendix A, attached hereto, consists of copies of Figures 1–18 of the Wallace patent.

2. Because the issue of damages will not be addressed in this proceeding, in view of the court's findings respecting liability issues, the precise number of gantries supplied by each manufac- turer has not been determined. Appendix B, a drawing of a Spanco 3–Way Adjustable Gantry found in Defendant's Trial Exhibit No. 20, has been attached as representative of an allegedly infringing gantry.

the desirable features of the Wallace gantries.

### 1. *The Patent–in–Suit.*

#### A. Description of the Gantry in the Specification of the Patent–in–Suit.

The gantry of the patent-in-suit has a bridging I-beam supported by two pairs of diverging legs. Connected to each leg is a bracing strut. The legs and bracing struts are mounted onto the I-beam by two horizontal mounting assemblies located on the top flange of the I-beam. Each mounting assembly has two pairs of spaced saddles or cross ties with inwardly directed "clamping ends" which fit under the upper flange of the I-beam and engage its undersurface when the I-beam is weighted, thereby supporting the I-beam. The mounting assemblies can be slid to any location along the I-beam to adjust the span (the longitudinal distance between the pairs of legs) of the gantry. The mounting assemblies are secured in any position on the I-beam by set screws which extend vertically through the saddle members and press against the top surface of the upper flange of the I-beam to clamp the flange between them and the upper surface of "clamping ends."

The gantry also includes "coupling means" which interconnect each leg, its associated bracing strut and the mounting assembly to which they are attached. The coupling means are adjustable so that the triangle formed by each leg, its bracing strut, and its mounting assembly can be changed. A portion of each coupling means pivotally mounts a leg and the upper end of an associated bracing strut a fixed distance from each other onto the associated mounting assembly. The legs and struts can be pivoted laterally with respect to the I-beam to adjust the spread of the legs. The gantry can be oriented in either inboard or outboard, or combined inboard and outboard bracing strut configurations, with the legs splayed outward at a desired small angle, e.g. 1.5°, while maintaining a fixed distance between the top end of each leg and its associated bracing strut. To achieve that end, the coupling means is adjustable, *i.e.*, it sets the bracing strut at one location when the bracing strut is arranged inboard and at another location when the bracing strut is arranged outboard. Thus, the effective length of each bracing strut can be changed. Moreover, this arrangement enables the leg and its associated bracing strut to be pivoted in a direction longitudinally (parallel to the longitudinal axis) of the I-beam. In an alternative embodiment, the effective length of the bracing strut is changed by changing the point at the upper end of the strut to which the mounting assembly is connected.

#### B. The Claims of the Patent–in–Suit

Plaintiff alleges that claims 1, 2, 11, and 12 of the Wallace patent cover the Spanco and other described gantries supplied to the United States. Since the parties dispute the meaning of certain of the claim terms, which terms are relevant to determining the issue of the scope of the claims (discussed, *infra*), the claims are reproduced below in the footnote, and the disputed claim terms are underlined.[3] The

---

**3.** 1. In a load-handling gantry,
a single, unitary bridging beam in combination with leg, brace, and mounting components so supporting said beam as to provide adjustment of gantry span, height, and spread, and use of the gantry in a number of leg and brace configurations, said components comprising:
legs arranged in pairs with the legs of each pair spanning the beam, and extending downwardly and diverging laterally of the beam;
a bracing strut associated with, and disposed to brace, each leg;
a pair of rod-like mounting assemblies each supported directly upon said unitary bridging beam, movable along the beam to selected positions to vary the span between said assemblies,
and including *clamping means frictionally securing said assemblies in said positions;*
and means for coupling upper portions of the legs of each pair, and of the bracing struts for said legs, to a corresponding one of said assemblies, and establishing, between the coupled upper portions of each leg and its strut, a distance which is substantially fixed, said means for coupling also including apparatus coupling a lower portion of each bracing strut to an intermediate portion of its corresponding leg, in a position in which each strut extends upwardly and away from its leg, said mounting assemblies and coupling means being so configured, and disposed with respect to each other and to said beam, as to afford lateral clearance between the beam,

defendants have admitted that claim 2 is dependent on claim 1, and claim 12 is dependent upon claim 11. Therefore, if claims 1 and 11 are infringed, claims 2 and 12 are also infringed. Therefore, only claims 1 and 11 will be analyzed for infringement.

### 2. *Description of the Accused Gantries.*

The accused Spanco gantries each have a pair of diverging, non-splayed legs at each end of a bridging I-beam and hanger (mounting) assemblies to which the pairs of legs and associated bracing struts are connected. Each hanger assembly comprises a pair of generally C-shaped hangers connected by a pair of flat plates (referred to as the "Spanloc" plates). Each C-shaped hanger includes a pair of inwardly directed ends having upper surfaces to support the undersurface of the upper flange of the bridging I-beam when the I-beam is weighted. The hanger assemblies are moveable along the beam to establish the span of the gantry by aligning selected longitudinally spaced apertures in the Spanloc plates with associated apertures in the upper flange of the I-beam. The hanger assembly position is secured (fixed) by inserting a bolt or hitch pin through the aligned holes. The hanger assemblies can be reversed on the I-beam to establish inboard, outboard, or combined brace orientation. In addition,

the coupling means is not adjustable in any manner to accommodate the change between inboard and outboard bracing.

The MHS and Motivation gantries are similar in many respects to the Spanco gantries. For example, the coupling means these gantries employ are not adjustable in any way to accommodate the change between inboard and outboard bracing, and the legs are not splayed. However, these other gantries do not have hanger assemblies like that of Spanco's wherein bolts or hitch pins extend through aligned holes in the mounting assemblies and the top flange of the I-beams.

### 3. *The Prior Art.*

The primary prior art patent which the Patent Examiner considered during prosecution of the patent-in-suit, is the Gibbins *et al.* patent, U.S. Patent No. 3,490,385. Mr. Wallace, inventor of the patent-in-suit, and Mr. Joseph Gibbins conceived the adjustable gantry disclosed in Gibbins *et al.* That gantry has two mounting assemblies onto which the upper ends of a pair of legs and their associated bracing struts are connected. Each mounting assembly comprises a short auxiliary I-beam having several clips mounted at the bottom flange which clips are "downwardly and inwardly

legs, and struts sufficient to permit location of said assemblies, with their coupled legs and struts, at various positions along the length of said beam, and *said coupling means further being adjustable, while substantially maintaining said fixed distance, to accommodate arrangement of the bracing struts for the legs of both pairs in configurations either inboard or outboard of the legs thereof, or in configuration in which the bracing struts of one leg pair are arranged inboard and the bracing struts of the other leg pair are arranged outboard.*
 11. In a load handling gantry, a flanged bridging beam in combination with leg, brace, and mounting components so supporting said beam as to provide adjustment of gantry span, height, and spread, and use of the gantry in a number of leg and brace configurations including inboard, outboard, and combination leg bracing, said components including: legs arranged in pairs with the legs of each pair spanning the beam and extending downwardly and diverging laterally of the beam; a bracing strut associated with and disposed to brace each leg;

a pair of mounting assemblies supported upon said beam and each comprising rod means, and *a pair of securement means spaced along each rod means and carrying its associated rod means,* each assembly extending in the direction of the length of the beam and movable therealong to vary the span between assemblies, *the pair of securement means of each assembly including clamp structure extending across the flange of the beam and frictionally embracing the same to hold the assemblies in selected positions along the beam;* and coupling means, in the region of said clamp structure, pinning upper end portions of the legs of a pair, and of the bracing strut for each such leg, to a corresponding one of said assemblies *with freedom for pivotal leg and brace movements both longitudinally and laterally of the beam,* and establishing, between the pinned end portions of each leg and its strut, a distance which is substantially fixed in each of said number of configurations.

turned" and which "slidably" engage the undersurface of the upper flange of the bridging I-beam in order to suspend the I-beam therefrom and enable the mounting assemblies to slide along the bridging I-beam to establish the desired span.

Figures 1 and 2 of the Gibbins et al. patent show only side views of the clips. However, from the side views, end views of the clips may be readily constructed to show a reasonable approximation of how the bridging I-beam is slidably mounted.[4] From the drawings it is clear that the Gibbins et al. patent did not contain a means to "secure" the mounting assemblies at the desired spacing other than the inherent friction between the clips and the undersurface of the upper flange when the bridging I-beam is weighted.

Further, the legs of the Gibbins et al. gantry are splayed outward at an angle of 1.5° irrespective of the orientation of its struts. To maintain splay, Gibbins et al. adjusts the coupling means or the triangle formed by the leg, its associated bracing strut and the mounting assembly to which they are connected. In particular, two longitudinally spaced pivots are located on each end of the auxiliary I-beam to enable the top end of the associated bracing strut to be connected to one pivot when the strut is "inboard" and to the other pivot when the strut is "outboard." Thus, Gibbins et al. changes the effective length of the triangle's base in order to maintain the desired 1.5° of outward splay in all brace configurations.

## DISCUSSION

 As noted above, Wallace's administrative claim against MHS was dismissed on the ground that Wallace's patent was invalid without a ruling on the question of infringement. However, Wallace preliminarily argues that the administrative bodies' silence on the infringement issue is inconsistent with the government's current position and that such inconsistency is enti-

tled to weight in this proceeding. Inherent in this argument is the contention that the Government, by virtue of the prior determination, is in some measure estopped from contending that the patent-in-suit is not infringed by the accused gantries. Plaintiff cites *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1358 (Fed.Cir.1983) to support its argument. While it is true that the Government cannot, with impunity, take an inconsistent position in a later court proceeding from one taken in a prior administrative matter, plaintiff misperceives the holding in *Hughes*. In that case the Federal Circuit refused to allow the United States to relitigate invalidity after the patent was found not invalid in a previous related court proceeding between the same parties. *Id.* at 1358–59. In the administrative proceeding there involved, there was no admission or finding that the patent-in-issue was actually infringed. Therefore, the *Hughes* case does not support Wallace's inconsistency argument. Further, since in this case the government made no admissions in the prior Army administrative proceeding relating to infringement which would legally preclude it from denying infringement, the estoppel doctrine is inapplicable. Accordingly, the Government's silence on the infringement issue in the Army administrative proceeding does not estop defendant from denying infringement in the present suit. *Deuterium Corp. v. United States*, 19 Cl.Ct. 624, 627–28 (1990).

### 1. *The Infringement Analysis.*

 28 U.S.C. § 1498 authorizes a patent owner to recover just compensation for unauthorized use or manufacture by the United States for inventions "covered by a patent," *i.e.*, covered by the patent claims. The legal and factual analysis employed to determine such unauthorized use or manufacture under § 1498 parallels the two-step analysis used to determine infringement

---

**4.** Defendants' Trial Exhibit No. 110 consists of a drawing, prepared for trial at the request of Mr. Podwil, one of defendant's expert witnesses, which depicts a fair and accurate representation of what the Gibbins et al. patent teaches one

skilled in the art, particularly as that patent relates to the clips. Appendix C, attached hereto, consists of copies of Figures 1 and 2 of the Gibbons et al. patent and Defendants' Trial Exhibit No. 110.

under 35 U.S.C. § 271(a). *Lemelson v. United States,* 752 F.2d 1538, 1548 (Fed. Cir.1985). First, we are required to properly ascertain the scope of the relevant claims. Second, we must determine whether each limitation of the claims so interpreted are found in or cover the accused device. *Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 837 F.2d 1044, 1054 (Fed.Cir.1988); *see Teledyne McCormick Selph v. United States,* 214 Ct.Cl. 672, 682–85, 558 F.2d 1000, 1005–07 (1977).

### A. Ascertainment of the Scope of the Claims—Legal Standards.

■ The patent specification contains "a written description of the invention, and of the manner and process of making and using it." The specification concludes with one or more claims that "particularly point out and distinctly claim the invention." 35 U.S.C. § 112. When drafting the specification and claims, the patentee has a "verbal license"; the patentee is, in effect, his or her own lexicographer and is free to define the claim terms in any way he or she chooses. *Lear-Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 888 (Fed.Cir.1984); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1558 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Therefore, when determining the scope of a disputed claim, the court must look to how the inventor defined the terms in the claim. Moreover, resolution of this issue by a court must be approached from the perspective of one skilled in the relevant technological area. *See* 35 U.S.C. § 112.

■ Further, the court is obliged to consider three sources of information: (1) the patent specification; (2) the other claims in the patent; and (3) the patent's prosecution history. *Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 837 F.2d 1044, 1056 (Fed.Cir.1988); *Howes v. Medical Components, Inc.,* 814 F.2d 638, 643 (Fed.Cir.1987); *Medtronic, Inc. v. Intermedics, Inc.,* 799 F.2d 734, 742 (Fed.Cir.1986); *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985); *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1562 (Fed.Cir.1990).

However, the specification is "the primary basis for construing the claims." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985).

■ In addition, we may also consider other forms of extrinsic evidence such as expert testimony. *See, e.g., Howes v. Medical Components, Inc.,* 814 F.2d at 643; *Lemelson v. United States,* 14 Cl.Ct. 318, 326 (1988), or texts such as dictionaries which explain common usage of the disputed claim terms. *See, e.g., Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1571 (Fed.Cir.1983). However, the claims are not to be construed using the patentee's commercial product. *ACS Hosp. Sys., Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1578 (Fed.Cir.1984).

■ The limitations in the two claims which are before the court are expressed in means plus function terminology. 35 U.S.C. § 112 provides, in pertinent part:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

To properly interpret the means plus function language under paragraph 6 of 35 U.S.C. § 112, we must determine whether the means of the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the specification for performing that function. *Palumbo v. Don-Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985). Stated otherwise, "[t]o interpret 'means plus function' limitations as limited to a particular means set forth in the specification would be to nullify the provision of § 112 requiring that the limitation *shall* be construed to cover the structure described in the specification *and* equivalents thereof." *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1574 (Fed.Cir.1985). Further, where the specification does not *require* a limitation, we are not permitted to read such a limitation into the claim.

*Lemelson v. United States,* 752 F.2d 1538, 1551–52 (Fed.Cir.1985).

There are various features of claims 1, 2, 11 and 12 of the patent-in-suit which are at issue in this case. They involve the clamping means, or clamp structure, as described in claims 1 and 11 and also the coupling means as described in claims 1 and 11. The parties presented expert testimony at trial to support their respective contentions regarding the proper definition of each disputed claim term. Plaintiff employed Lawrence Grimm and the Honorable William Schuyler, Jr., and defendants employed Robert Podwil and James Currie as experts. In the following sections, for each disputed claim term, we will describe relevant portions of the specifications, other claims, prosecution history, and other extrinsic evidence submitted at trial before analyzing evidence and defining the disputed claim terms.

B. Assessment of the Scope of the Claims—Definition of the Disputed Terms.

█ The first disputed claim term concerns the *coupling means.* Claim 1 recites the following:

1. "... coupling means further being adjustable ... to accommodate arrangement of the bracing struts ... in configuration either inboard or outboard of the legs thereof...."

Wallace contends that the function of the coupling means is to maintain a fixed distance between the upper ends of the legs and braces, maintain lateral clearance (e.g. the width between a pair of legs), and allow the mounting assemblies to be taken off of the I-beam to have their orientation reversed 180° (e.g. change from inboard to outboard bracing). Defendants contend that the coupling means require adjustability of the legs to enable them to maintain outward splay if desired. It is undisputed that none of the three accused gantries have any means by which the splay of the legs can be adjusted even minimally.

5. Defendants do not contest that this aspect of the coupling means exists in the accused gan-

As indicated above, our analysis of this first disputed claim begins with the language of the specification. There are several statements in the specification corresponding to the coupling means. In fact, we find specific specification references to elements which couple the bracing struts to the mounting assemblies. For example:

Col. 4, lines 34—et seq. [T]he *required* change in effective strut length is achieved by the use of very simple strut *coupling means....* (Emphasis added.)

Col. 6, lines 3–8. A *special feature ...* involves the manner in which the bracing struts 15 are *coupled* to the mounting assemblies with freedom for adjustment of the effective length of each strut when it is changed from inboard to outboard bracing.

Col. 6, lines 28–32. The manner in which this *strut coupling apparatus* functions can be appreciated by comparing the adjustment for inboard bracing, shown ... with the position of the parts under outboard bracing.... Col. 6, lines 28–32. (Emphasis added.)

Col. 7, line 65—col. 8, line 2.2. ... said means for *coupling* also including apparatus *coupling* a lower portion of each brace strut to an intermediate portion of its corresponding leg....[5]

There are other descriptions in the specification of different embodiments of the coupling means and each concerns changing the effective length of the bracing strut by adjusting the point at which it is attached to the leg.

The specification also describes the result achieved by the coupling means as follows: "It will be observed that, in each configuration, the desirable small camber or outward splay angle ( ... about 1.5°) is present.... Such *camber, while not essential,* has a desirable stabilizing effect...." Col. 4, lines 20–27. (Emphasis added.)

We also note that claim 6, dependent on claim 1, specifically requires that "legs of

tries.

one pair are splayed ... at a predetermined small angle" and that the "coupling means includes an instrumentality adjustable to provide for changing the effective length of any strut."

The prosecution history of the Wallace patent application is also pertinent. During that prosecution Wallace added, after a rejection under Gibbins *et al.* '385, the limitation that the adjustable coupling means perform their adjustment *while substantially maintaining said fixed distances* (e.g. the distance between the upper end of the bracing strut and the upper end of the associated brace during adjustment).[6]

In response to the first rejection, Wallace stated:

> [A]pplicant's invented apparatus is characterized by simple and relative inexpensive structure which provides *all* the following features:
>
> \* \* \* \* \* \*
>
> very simple adjustment of gantry span, height, and spread while *maintenance of a desirable, predetermined longitudinal splay angle ....*

(Emphasis added.)

Since the above disputed claim term in claim 1 is written in means plus function language, to properly interpret this term we must first define the function which the disputed means term performs. *See Intel Corp. v. U.S. Int'l Trade Com*, 946 F.2d 821, 841 (Fed.Cir.1991). Wallace contends, citing *Intel Corp.*, 946 F.2d at 842, that in construing the coupling means limitation, the specification should be examined only to determine the structure which performs the function stated in the claim. However, in the case at bar, the function of the coupling means is disputed. In such event, the court must look beyond the language of the claim to determine what function is being claimed. Accordingly, we are required to examine the specification, other claims and prosecution history to interpret the function of the claim. *Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734, 742 (Fed.Cir.1986).

Claim 1 has three clauses pertaining to the coupling means, but the issue in the present case only pertains to the adjustability of the coupling means. The specification has references to "strut coupling means" and a "strut coupling apparatus" whose function is to adjust the effective strut length when the legs are changed from inboard to outboard configurations and vice versa. Wallace contends that the adjustability feature relates to accommodating the legs in inboard or outboard positions (rotating them 180°) and not to adjustability of the splay angle. Defendant argues that this feature involves not only rotation of the legs, but also a maintenance of the splay angle through a longitudinal adjustment. To determine how the coupling means can be adjustable, we must examine the language of the claim. There we find that the coupling means does more than merely permit a 180° rotation of the legs. It actually joins the upper portions of the legs and bracing struts to the rod-like mounting assemblies. The coupling means also includes apparatus for coupling bracing struts to an intermediate portion of the corresponding leg. Additionally, the coupling means is configured to afford lateral clearance between the beam, legs and struts sufficient to permit location of the assemblies at various positions along the beam.

Also, the claim language recites, "said coupling means further being adjustable ... to accommodate *arrangement of the bracing struts* for the legs of both pairs in configurations either inboard or outboard of the legs thereof...." The adjustability feature here referred to is to the arrangement of the bracing struts. Next, it is clear that the specification refers to strut coupling apparatus or means whose function is to adjust the effective strut length. This adjustability feature, through a change in strut length, allows the gantry legs to have outward splay in both inboard and outboard configurations. Wallace contends that the adjustability referred to is produced in Appendix D.

---

**6.** A copy of claim 1 as amended by Wallace in response to the first Office Action has been

merely the reversing of the orientation of the legs between inboard and outboard positions. However, this contention is *not* consistent with the claimed function which the coupling means performs. It is the *mounting assemblies* which are reversed when changing the orientation of the legs between inboard and outboard positions. Accordingly, we conclude that this function, the adjustment of the coupling means, is not limited to a 180° reversal of the legs for purposes of inboard and outboard positioning as Wallace contends, but that there are other purposes served by this adjustability feature.

One of these purposes is to assure that Mr. Wallace's patented gantry would have a small amount of splay in the legs, even though this splay was not considered essential. The availability of this small of amount of splay is the reason for having an adjustment when the legs are alternated between inboard and outboard configurations. Simply stated, the function of the coupling means is to permit adjustment of the bracing struts so that the legs can have splay. There is no requirement that the legs actually have splay, only that the effective length of the bracing strut be adjustable to have splay *if desired* by the user of the gantry.

There are other clauses in claim 1 which provide interpretive help with regard to the meaning of coupling means. In fact, the clause in claim 1 preceding the disputed clause refers to the coupling means having "apparatus coupling a lower portion of each bracing strut to an intermediate portion of its corresponding leg...." The structure of the coupling means as described in the specification, which functions so as to allow the desired adjustability to permit splay, includes a metal collar or ring which fits around each gantry leg and is also attached to each bracing strut. Each collar or ring has a hole for receiving a leg adjusting pin which fixes the collar to an appropriate position on the leg. The coupling means also includes another structure which allows the tops of the legs and bracing struts to pivot where they are attached

to the saddle structure when the latter is positioned on the I-beam.

The prosecution history of claim 1 also indicates that the adjustability of the coupling means was intended to refer to the adjustability for splay. After the first Office Action, Wallace amended claim 1 to require that the adjustable coupling means perform adjustment "while substantially maintaining said fixed distances" (e.g. the distances between the top of each leg and the top of its associated bracing strut). It is unclear why Wallace would add this limitation to the coupling means if the adjustability feature was incorporated only to allow reversing orientation of the legs from inboard to outboard configurations. However, if the adjustability feature is interpreted to be an adjustment of the effective strut length, as this court interprets it to be, then the requirement of maintaining the fixed distances is an appropriate limitation to the claim. Otherwise, it is likely that this distance would change when the effective strut length is changed.

Plaintiff contends that "[i]n the prosecution of his application, Mr. Wallace stated, and this fact was understood by the examiner, that adjustment of the coupling means included reversal of the rod-like mounting assemblies upon the beam and the consequent change between inboard and outboard bracing."[7] If this statement were true, then the adjustment of coupling means would encompass reversing the orientation from inboard to outboard bracing. However, there is no support in the prosecution history for plaintiff's statement that adjustment of the coupling means refers to reversing the orientation of the legs. Plaintiff attempts to find support for this statement by pointing to comments in the prosecution history which refer to adjustability of the mounting assemblies. However, the rod-like mounting assemblies are not part of the coupling means. Both the claims and specification refer to the coupling means and rod-like mounting assemblies as different elements. Consequently, it is not logical to interpret the rod-like

7. Plaintiff's Post–Trial Reply Brief filed February 21, 1992 at 14.

mounting assemblies as part of the coupling means.

Further, claim 1 specifically refers to a function of the coupling means as being one to couple upper portions of the legs to the [rod-like mounting] assemblies, e.g. coupling two different elements through the use of a coupling means. Plaintiff's argument that the rod-like mounting assemblies are part of the coupling means would require that the coupling means no longer couple two elements together but merely attach one element to the coupling means. The definition of the noun "couple" is "[s]omething that joins or connects two things together; link", and the definition of the noun "coupling" is "[s]omething that links or connects." *The American Heritage Dictionary*, 332 (2d. College Ed., 1982). Clearly, the accepted definition of coupling conflicts with plaintiff's interpretation—one that would include the rod-like mounting assemblies as part of the coupling means. Plaintiff's interpretation would require that the coupling means not function as a means to couple two separate elements together, but as a means for attachment of only one element to the coupling means. Therefore, from a definitional standpoint, it is improper to include the rod-like mounting assemblies as part of the coupling means. In sum, we find no support in the specification, claims, or prosecution history for the interpretation that adjustment of the coupling means refers simply to reversal of the orientation of the legs as plaintiff contends.[8]

Wallace also contends that the doctrine of claim differentiation precludes an interpretation that the coupling means requires adjustability of the legs to have splay. In this regard, plaintiff points to the specific requirement of splay in claim 6. Claim 6 does require an interpretation that the effective strut length be adjustable so that the splay of the legs can be adjusted. However, the doctrine of claim differentiation is a judicially developed guide, not a rigid rule. Since the doctrine is merely a guide, we are not permitted to apply it so

as to override the applicable statutes. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991). Notwithstanding the claim differentiation doctrine, if a particular claim can only be interpreted in one way, similarity between that claim and other claims are to be tolerated. *Id.* at 1538. Therefore, it is immaterial in the present case that claim 6 specifically requires that the legs have splay because a proper interpretation of claim 1, under 35 U.S.C. § 112, requires that the legs to be adjustable have splay. Accordingly, we find that the doctrine of claim differentiation does not obviate our interpretation that the coupling means language in claim 1 does require adjustability of the legs to have splay.

We will next consider claim 11 because that claim also contains disputed language that pertains to the way in which the legs and bracing struts couple to the saddle structure. As pertinent, claim 11 provides as follows:

2. "... coupling means ... with freedom for pivotal leg and brace movements both longitudinally and laterally of the beam...." (Claim 11.)

Plaintiff does not dispute the fact that none of the three accused gantries have any way in which the legs and braces can pivot longitudinally (along the length) of the beam. However, Wallace contends that this disputed language does not require pivoting of the legs and braces both longitudinally and laterally of the beam, but that the language actually means that the legs and braces pivot laterally and slide longitudinally. In support of this contention, Wallace emphasizes that there is specification language covering only pivoting to adjust the spread of the legs and that there is no mention of longitudinal pivoting. Also, Wallace contends that its position is further supported by the fact that application claim 12, an independent claim which was cancelled during prosecution of the application, recited different language to have pivoting in the longitudinal direction.

---

**8.** Moreover, this court cannot accept plaintiff's interpretation of the disputed claims based upon equitable considerations since to do so

would take the court beyond interpretation of disputed terms and would amount to a reworking of the claims.

Thus, it argues that cancelled application claim 12 reveals exactly how it would have written claim 1 if it intended that claim 1 include the limitation of longitudinal pivoting.[9]

We begin our analysis of these contentions with consideration of the language of the specification. From our reading of that specification we can see no basis for concluding that longitudinal pivoting is not a required function. The specification and drawings of the patent-in-suit show that the legs are to pivot longitudinally on pivot pins 41 and the bracing struts pivot longitudinally on strut pivot pins 39. This longitudinal pivoting allows splay in the legs to be adjusted to the predetermined degree. The top of each strut has a ferrule or cap 45 which is slidably mounted on the strut 15. Each cap 45 is apertured to receive the strut pivot pin 39. (See col. 5 line 35—col. 6 line 2.)

The specification also states that "[t]he legs 14 and their bracing struts 15 are so associated ... as to have ample freedom for movement to different stations along the beam 10, and the legs and struts are pivotally coupled to their mounting assemblies with freedom for movement in planes transverse of the beam." Col. 3, lines 40–49.[10] The disputed language recites, "freedom for pivotal leg and brace movements *both* longitudinally and laterally of the beam." (Emphasis added). The coupling means of the specification and drawings allows the pivoting of the legs and braces both longitudinally and laterally of the beam. Although arguably there may be some ambiguity as to whether the word "both" in the claim refers to the legs and braces, or the longitudinal and lateral pivoting, Wallace cannot use this language to

its advantage. A primary purpose of claim language is to give fair warning to persons in the art of what will constitute infringement. *See United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232–33, 63 S.Ct. 165, 167–68, 87 L.Ed. 232 (1942). A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement would discourage invention only a little less than unequivocal foreclosure of the field. *See Id.* at 232, 63 S.Ct. at 167. The plain language of the claim appears to require pivoting both laterally and longitudinally, and we may not permit the plain meaning of this language to be twisted. Obviously, it would not be proper to impose a limitation on the claims which is not recited in those claims. However, our reading of the pertinent claim language does not have that effect since that claim language itself appears unequivocally to require pivoting both longitudinally and laterally. The fact that canceled independent claim 12 recited the requirement of longitudinal and lateral pivoting in a different manner than does claim 11 does not necessarily mean that the claims were referring to different functions and structures. Therefore, regardless of the language used in canceled claim 12, we interpret the coupling means as used in claim 11 to cover the performance of longitudinal pivoting *and* lateral pivoting.[11]

Additionally, Wallace's desired interpretation of the coupling means requires the coupling means to slide longitudinally. However, we believe this interpretation is improper because the rod-like mounting assemblies, together with their respective saddle structures, comprise the elements which actually slide along the I-beam. Thus, the coupling means alone do not

9. The relevant portions of cancelled claim 12 provide:

> ... and means pivotally associating the upper ends of the legs with said mounting means and providing a first leg pivot axis extending lengthwise of the beam, to accommodate variable divergent spread of the legs with lateral clearance between legs and beam, and a second leg pivot axis extending in the direction of the width of the beam, and providing for adjustment of the angle of the leg with respect to the length of the beam.

10. There have been no comments or amendments made with regard to the disputed portion of claim 11. Wallace, however, does contend that cancelled claim 12 is a relevant part of the prosecution history and supports its contention regarding the proper interpretation of claim 11.

11. It would appear that the patentee decided to cancel claim 12 because it was duplicative of the two pivotal actions already adequately described in claim 11.

slide. They are merely attached to the mounting assemblies which do slide.

Wallace seeks to have longitudinal pivoting excluded from the claim interpretation on the logic that the language in the specification covers only pivoting to adjust the spread of the legs without mention of longitudinal pivoting. (See col. 3, lines 40–49.) However, the specification also includes a description of pivot pins 41 and 39 whose only purpose is to allow for longitudinal pivoting. (see col. 5, line 35—col. 6, line 2.) Therefore, we find that there is ample support in the specification to interpret the coupling means as providing for both longitudinal and lateral pivoting.

Also, we note that the prior art does not require that the claims of the patent-in-suit have a coupling means which pivots both longitudinally and laterally. *See* U.S. Pat. 3,490,385, to Gibbins et al., col. 3, lines 9–15). Thus, it is the claim language itself which limits the infringement to gantries which pivot both longitudinally and laterally. This court cannot change this or any other claim language in an adversarial proceeding once the patent has issued.

We will next consider the disputed terms in claims 1 and 11 which relate to the clamping function. Claim 1 describes a "clamping means frictionally securing said assemblies in said positions" and claim 11 describes a "clamp structure ... frictionally embracing...."

The Motivation and MHS gantries admittedly have functional types of clamping means and structure as recited in claims 1 and 11 of the patent-in-suit. However, the parties vigorously dispute whether the hitch pin or bolt-through arrangement of the Spanco gantry is sufficiently different from the claims of the patent-in-suit to avoid infringement. Wallace contends that the terms "clamping means" and "clamp structure" used to describe the securement of the I-beam in the clamping saddles do not require a set screw but are encompassed merely by the weight of the I-beam in the saddle bracket once the gantry is assembled. Defendants contend that the mere resting of the weight of the I-beam upon the brackets involves no clamping

action and that as long as no specific clamping structure, such as a set screw, is present there can be no infringement of these two claims.

Again, our analysis must first interpret the language of the patent-in-suit's specification. The only means in that specification specifically enunciated for performing a frictional engagement function is the combination saddle cross-ties 26 and 27 and the set screws 30 and 31 or some other "convenient means." Nowhere does the specification disclose that the applicant is relying in any degree upon the weight of the I-beam on the clamping ends to perform this function.

The last sentence of the Abstract states that, "[a]ll adjustments relative to the beam may be made through *external frictional gripping apparatus*, co-operable with a standard imperforate beam." (emphasis added.) Column 5, lines 8–15, of the patent-in-suit discusses how the securing or holding of the mounting assemblies is effected, as follows:

> [T]he spaced cross-ties can be slid along the I-beam to various locations ... and fixed in any selected location by any convenient means which may take the form of the set screws 30 for each of the cross-ties 26 and 26', and the similar set screws 31 for each of cross ties 27 and 27'.

Column 6, lines 27–29, states:

> The entire assembly may be readily repositioned along the beam, it being necessary, or course, to loosen the set screws 30 and 31.

Finally, Column 2, lines 34 and 35, states:

> Fig. 12 is a detailed view of a clamp, or saddle device for securing the brace members to the I-beam.

Also, we consider it significant that Figure 12 of the patent-in-suit illustrates not only the saddle clamp but also the set screws 30. As to the issue of whether the hitch pin securement feature can be considered an equivalent to the claimed clamping structure, Column 1, lines 48–50, states, "I uti-

lize only a single, unitary, beam, which has no bolt perforations in any part thereof." [12]

The prosecution history is particularly relevant to the resolution of this issue. During the course of the patent prosecution, the Patent Office rejected claim 1 under 35 U.S.C. § 102 in view of Gibbins *et al.*, U.S. Pat. 3,490,385. Gibbins *et al.* discloses an adjustable gantry with a bridging I-beam. The gantry is supported by two pairs of legs, each attached to its own short I-beam. The bridging I-beam is mounted below the short I-beams, not by the use of screws but by clips. Column 2, lines 69–71, states, "[t]he two short I-beam members 10 and 11 provided with downwardly and inwardly turned clips 12 in which clips the bridging I-beam 13 is slidably mounted."

After the § 102 rejection under Gibbins, Wallace amended claim 1 to include the limitation of "clamping means frictionally securing said assemblies in said positions." [13] Wallace also added application claim 21, subsequently renumbered as patent claim 11, which included language regarding the clamping structure. Other amendments made by Wallace after the first PTO Office Action to claim 1 include describing the mounting assemblies in a more detailed fashion, "... a pair of *rod-like* mounting assemblies *each* supported directly upon said *unitary bridging beam.*" [14]

Also of interest in the prosecution history is the fact that application claim 12 was never allowed by the PTO. This claim included the language "mounting means for the legs including saddle structure spanning the width of the flanging in slidable engagement therewith ... and configured to ... be externally clamped thereon...." [15] Application claim 12 did not include any limitation relating to "rod-like

mounting assemblies" or "rod means" as is recited in patent claims 1 and 11.

At trial, Plaintiff's expert Grimm testified that the Gibbins *et al.* patent does not teach that the bridging I-beam is slidably supported by the clips 12 of the mounting assemblies, even though explicitly stated in its language. We find that plaintiff's contention in this regard is not credible.

Defendants' witness Uhlig testified that the securing action of the Spanco Gantry is accomplished by bolts or hitch pins which mechanically interfere with motion, rather than the use of friction for that purpose. [16] Further, defendants' experts Currie and Podwil both testified that the customary and familiar meaning of the term "clamp" entails a device in which force is applied to a member or members from opposite sides, such as a conventional C-clamp. [17] Both Currie and Podwil persuasively testified that the combination of the saddle crossties with their inwardly directed clamping ends and the set screws of the patent-in-suit define a clamp in its customary sense.

At trial, Wallace demonstrated that it was physically possible to reposition the gantries while the set screws were not tightened. Also, it was shown that Spanco's gantry could be moved around without the hitch pin being in place. Wallace performed these demonstrations to show that the set screws were not absolutely necessary in the operation of the gantry but were merely a safety feature. Also at trial, in rebuttal, defendants introduced the dictionary definition of "secure" as:

1. To guard from danger or risk of loss.
2. To make firm or tighten; fasten.
3. To make certain; guarantee.

*The American Heritage Dictionary*, 1109 (2d. College Ed., 1982).

12. After a careful reading of the other claims in the patent, we conclude that they do not materially assist in defining what encompasses the disputed clamping means or structure.

13. A copy of claim 1 as amended by Wallace in response to the first Office Action has been produced in Appendix D.

14. The underlining signifies language added by the amendment.

15. The amended form of application claim 12, which was never allowed, has been reproduced in Appendix D.

16. Tr. 588, line 23 to 589, line 14.

17. Tr. 633, lns. 6–15; 751, lns. 8–14.

Based upon the foregoing, the court concludes that plaintiff's contention is incorrect and that the term, "clamping means," as used in the patent-in-suit, does not cover the Spanco gantry's bolt or hitch pin method for prevention of movement. The disputed clamping means of claim 1 and securement means including clamp structure of claim 11 are claim language provisions written in means plus function language as permitted by the sixth paragraph of 35 U.S.C. § 112. It is evident from the language of claim 1 itself that the function of the "clamping means frictionally securing said assemblies in said positions" is to frictionally secure the bridging beam to the mounting assemblies through clamping. This function takes into account the words recited in the claim related to the clamping means. If we gave any other function to the clamping means, we would have to ignore claim language or improperly add functions not required by the claim. Similarly, the function of the "securement means ... including clamp structure extending across the flange of the beam and frictionally embracing the same to hold the assemblies in selected positions along the beam" is also interpreted so as to frictionally secure the bridging beam to the mounting assemblies through clamping.

Wallace argues that clamping is not part of the function but an adjective used to identify structure.[18] This argument is incorrect for two reasons. First, assuming that the described clamping does refer to structure, it is inconsistent to state that a clamping structure does not perform a clamping function but only frictionally secures. Clearly, the clamps in the patent-in-suit perform the functions of both frictionally securing *and* clamping. Second, when a particular structure is recited in a means plus function element, the structure serves merely to specify the function of the means, not what it is structurally. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed.Cir.1991). Therefore, we reject Wallace's contention and find that the clamping refers to the function which the means performs.

Next, we must examine the specification to determine what structure actually performs this clamping function. The structure for both the clamping means of claim 1 and the securement means of claim 11 is interpreted to be *the saddle structure for holding the I-beam and the set screws.* The set screws provide a downward force onto the I-beam clamping the element down on the saddle structure and creating friction between the I-beam and the saddle structure, which is in addition to the inherent friction caused by the weight of the I-beam resting in the saddle structure.[19]

Wallace argues that the structure of the clamping means does not include the set screws. If the set screws were not illustrated and described in the Wallace patent, it would be somewhat more logical to interpret the I-beam hanging in the saddle structure as encompassing the clamping means in its entirety. However, because the set screws are present in the specification and do clamp down on the I-beam, we cannot logically omit them from the structure which performs the function of frictionally securing through clamping. Applicable legal precedent requires that we give words their normal meaning unless they are defined differently in the specification. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984). It is improper to give a word a non-standard meaning after the patent has issued. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1564 (Fed.Cir.1990). To state that the clamping force is supplied solely by the weight of the I-beam when there exists set screws whose main function is to clamp, would be to improperly extract from the specification and drawings only those features which Wallace desires. Such a narrowing of focus would be inconsistent with a proper interpretation of the claims in light of the specification.

---

**18.** Plaintiff's Br., p. 26.

**19.** For purposes of simplicity, because the clamping means of claim 1 and the securement means of claim 11 are interpreted to encompass the same function and structure, and because analysis as to one will be similarly pertinent to the other, both, hereinafter, will be referred to as "clamping means."

Wallace argues that the set screws were included merely for safety purposes and, therefore, they are not essential to the invention and should not be considered as a structural claim limitation. We also find this argument unavailing. In reality, the invention would never be used without the set screws being tightened down on the I-beam. While Wallace describes the set screws as merely a safety feature, we believe, based upon the evidence presented, that they are an *essential* safety feature and an integral part of the clamping means. In short, because the claims require a clamping means and the set screws perform the critically important function of keeping the gantry safe, we interpret the set screws as comprising part of the structure which performs the function of securing the I-beam.

Wallace next contends that because the specification uses the word "fixed" when referring to the function which the set screws perform and uses the word "clamp" when referring to the saddle structure, the clamping means should be limited to the saddle structure and not include the set screws. However, "fixed" is synonymous with "secured" and nothing in the patent expressly states that the set screws perform *only* the function of fixing and not securing or clamping. The set screws can perform the function of fixing or securing *and* clamping. Therefore, the function should not be limited to fixing. If we interpreted the function of the set screws as merely one of fixing, we would, in effect, be imposing an improper limitation on their function which is not clearly present in the claims or specification.

Defendants contend that the only reason the claims were allowed over the prior art is because they contain the feature of set screws. However, this contention is not correct. While we have interpreted the claims to require set screws or structural equivalents thereof, in our view the prior art does not require that the claims be interpreted to have set screws. Application claim 12, which was never allowed by the PTO, did contain the feature of an I-beam which was externally clamped on a saddle structure. The external clamping

was performed by set screws, as revealed in the specification, and this external clamping was not sufficient to have the combination allowed. Noticeably missing from application claim 12 is any mention of rod-like mounting assemblies which all allowed claims require. This fact would indicate that the set screws were not the reason why the claims were allowed, but that they were allowed because the claimed combination included rod-like mounting assemblies. Accordingly, the court finds that defendants' contention that the prior art requires that the claims be interpreted to have set screws is without merit.

Defendants also argue that the prosecution history requires that the claims be interpreted to require clamping of the I-beam in the saddle structure by set screws or structural equivalents thereof. In support of this contention defendants state that claim 1, as originally filed, only required the mounting means to be moveable, but subsequently, in response to the first Office Action, Wallace included the limitation of "clamping means" and states that because this limitation was added in response to a rejection, the claims are required to have clamping. While we have interpreted the claims to require clamping for the reasons assigned in our foregoing analysis, our conclusion does not rest upon the prosecution history. It would appear that Wallace voluntarily added the clamping means in response to the rejection. However, the fact that he voluntarily did so, is not determinative. Where a patentee's amendments were not required in response to an examiner's rejection or critical to the allowance of the claims, no prosecution history estoppel exists. *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1284 (Fed.Cir. 1986). We are cognizant of the fact that the Federal Circuit has voiced disapproval of any speculative inquiry as to the necessity, from the standpoint of patentability, of an amendment clearly made to avoid a reference. *See Prodyne Enters., Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583 (Fed. Cir.1984). However, in this case, we can see no improper speculation in our stating

that the clamping means frictionally securing the assemblies was not the feature which, from the examiner's viewpoint, made the claims allowable. Clearly, application claim 12, which was not allowed, included a saddle structure which was in slidable engagement with the I-beam, embraced the flanging and was externally clamped (e.g. secured) thereon. Therefore, clamping cannot be the feature of the combination which the examiner thought made the claims allowable. Accordingly, we further find that the prosecution history does not support defendants' argument that the clamping means require the use of the set screws.

The second step in our infringement analysis involves a determination of whether the claims, as we have interpreted them in the first part of the foregoing infringement analysis, cover the alleged infringing gantries. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). A claim can cover a device in either of two ways. First, an accused device can literally infringe a patent claim if that device embodies each and every element in the claim. *Mannesmann*, 793 F.2d at 1282; *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 257 (Fed.Cir.1985) (citing *Fay v. Cordesman*, 109 U.S. 408, 420–21, 3 S.Ct. 236, 244–45, 27 L.Ed. 979 (1883)). Second, in the absence of literal infringement, a court can find infringement under the doctrine of equivalents. To have infringement under the latter, the doctrine of equivalents, a patentee must show that the accused device performs substantially the same function in substantially the same way to achieve substantially the same result. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed.Cir.1985).

Thus, we must first determine whether the accused gantries literally infringe any of the claims of the patent-in-suit. Defendants contend that claim 1 is not literally infringed because none of the accused gantries possess a coupling means which is adjustable as claimed. Further, defendants claim that the Spanco gantries, do not literally infringe because they do not have a clamping means. Based on the analysis of all evidence submitted at trial

relating to the configuration of the accused devices, the court concludes that plaintiff has not established literal infringement of claim 1. As to the disputed coupling means of claim 1, there is nothing in any of the accused devices which performs the function of adjusting the effective strut length. Claim 1 has not been interpreted to require splay, but it does require adjustability of the effective strut length to have splay in the gantry if desired. Consequently, because none of the accused devices are physically capable of having their effective strut lengths adjusted to have splay, for this reason alone we find that there can be no literal infringement of claim 1 by any of the accused devices.

With respect to the clamping means, it is conceded that the Motivation and MHS gantries possess the claimed clamping means. However, the parties dispute whether the Spanco gantries possess this feature. Clearly, if the Spanco gantries do, in fact, possess this particular feature, there would be literal infringement. However, to literally infringe a means plus function element, the accused device must have an element which performs the particular function of the claimed element and has the same or equivalent structure. *Intel Corp. v. U.S. Int'l Trade Com*, 946 F.2d 821, 841 (Fed.Cir.1991). In the patent-in-suit the claimed clamping means performs the function of frictionally securing the bridging beam to the mounting assemblies through clamping. However, the accused Spanco gantries do not have set screws or any other structure whose specific purpose is to clamp the I-beam in the saddle structure. As our prior analysis shows, the Spanco gantries do possess hitch pins or bolts. These, combined with the holes drilled in the I-beam, act to simply hold in place the saddle structure once that structure is positioned upon the I-beam. Thus, these elements, in combination, clearly do not function as a clamping force to frictionally secure the saddle structure to the beam.

An additional way in which the Spanco I-beam is secured in the saddle structure is by the inherent frictional force of the I-

beam resting in the saddle bracket once the gantry is assembled. Of course, the addition of an element, in this case the hitch pin, is not sufficient to avoid infringement if all limitations of the claims are met. *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). Plaintiff unquestionably demonstrated at trial that it is not absolutely necessary for the Spanco gantries to have a hitch pin to actually function as a gantry. Whether there is a hitch pin or not, there is still a substantial amount of friction between the I-beam and the saddle structure. Therefore, the Spanco gantries do possess a means which performs the function of frictionally securing the bridging beam through the use of a downward force, the inherent weight of the I-beam in the saddle structure. Clearly, then plaintiff has provided sufficient evidence to meet the first test for literal infringement of a means plus function claim.

The second step that must be shown for infringement of a means plus function claim is that the element in the accused device which performs the claimed function has the same or equivalent structure as the structure of the claimed means. *Intel*, 946 F.2d at 841. We have interpreted the structure of the claimed means to comprise the saddle structure for holding the I-beam and the set screws which, when properly engaged, provide a downward force onto the I-beam. This means is clearly not "the same" structure as that in the Spanco gantries because the Spanco gantries do not possess set screws. However, there can still be literal infringement if the I-beam in the saddle structure together with the set screws is equivalent to the saddle structure and inherent weight of the I-beam in the Spanco gantries.

An important factor in the determination of equivalents is whether a person reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent and one that was. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Although the application of a doctrine of equivalents analysis is not merely a repeat of the literal infringement analysis involving equivalents under Section 112, *Graver Tank* concepts of equivalents are relevant in any equivalents determination. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 975 n. 4 (Fed.Cir.1985). In our view one of ordinary skill in the art would not substitute an I-beam resting in the saddle bracket and frictionally secured by its own weight or the weight of a load on the gantry for an I-beam secured in a saddle bracket with set screws because such a substitution would obviously cause the gantry to be less stable and in some situations unsafe to use. This fact indicates that the two compared elements, defined as clamping means, are not structural equivalents. Therefore we find that the Spanco gantries' clamping means do not literally infringe the patent-in-suit's claim 1 under this interchangeability test.

As to the disputed coupling means of claim 11, we have interpreted the coupling means as requiring that the legs be capable of pivoting longitudinally with respect to the I-beam so that the legs can have splay. It is undisputed that none of the accused gantries has legs or struts which pivot longitudinally of the beam. Therefore, we hold that there can be no literal infringement of claim 11, or claims dependent thereon.

Plaintiff has also failed to establish literal infringement of claim 11 with respect to the securement means for clamping for the same reason that there is no literal infringement by the clamping means of claim 1. We have interpreted the function and structure of the clamping means of claim 1 as the same as the securement means for clamping of claim 11. Accordingly, since we would apply the same reasoning that we applied to claim 1 to find no literal infringement of claim 11, we also hold that the securement means described in claim 11 is not literally infringed by the accused Spanco gantry.

 We will next consider whether the accused gantries infringe under the doctrine of equivalents. That doctrine is a judge-created doctrine devised to do equity

"in situations where there is no literal infringement but liability is nevertheless appropriate to prevent what is, in essence, a pirating of the patentee's invention." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed.Cir.1985). The Federal Circuit's controlling precedent in the doctrine of equivalents area states:

> When there is no literal infringement, infringement can be found under the doctrine of equivalents where plaintiff shows the presence of every element or its substantial equivalents in the accused device. To be a "substantial equivalent" the element substituted in the accused device for the element set forth in the claims must not be such as would change the way in which the function of the claimed invention is performed. (citations omitted).

*Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). However, infringement under the doctrine of equivalents may be established even though the accused device requires a greater number of components to perform functions which the patented invention achieves by using one component. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989). "[T]he determination of equivalency is not subject to a rigid formula. An equivalent must be found for every limitation of the claim somewhere in an accused device but not necessarily in a corresponding element...." *Id.* at 1259. Under either literal infringement or infringement under the doctrine of equivalents, the patentee must demonstrate infringement by a preponderance of the evidence. *See, e.g., Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985).

Viewed broadly, the patented and accused gantries have obvious similarities in their respective functions, the ways in which they work and the results they achieve. However, there are key requirements in the claims which are absent from the accused gantries. These absences cannot be ignored. Each limitation of the claim must have at least its equivalent in the accused device. *Lemelson*, 752 F.2d at 1550; *Pennwalt*, 833 F.2d at 935.

Claim 1 requires an adjustable coupling means so that the legs can be arranged in inboard or outboard configurations. We have interpreted this limitation to require that the coupling means function to allow adjustment in the angle or splay of the legs. The way in which this is performed in the Wallace gantry is to provide for adjustment of the effective length of the struts so that the gantry will have the capability to have outward splay in either inboard or outboard configurations. As we have previously found, none of the accused gantries have any means which perform this function or achieve this result. The element is simply missing from the accused gantries and there is no equivalent for it in any of the accused gantries. Hence, we find that claim 1 cannot be infringed by any of the accused gantries under the doctrine of equivalents.

As to the requirement of a clamping means, the function of the claimed clamping means is to secure the saddle bracket selected in a position on the I-beam. The way in which this is done in the patented gantry is by a downward force from the set screws in combination, of course, with the weight of the I-beam. The result achieved is a stable gantry in which the span of the legs can be adjusted to variable widths within the limits of the I-beam. Defendants do not dispute that the Motivation and MHS gantries have the disputed clamping means. However, we must determine whether the Spanco gantries have an element which is equivalent to the claimed clamping means. The hitch pins or bolts on the Spanco gantries perform the same general function of holding or securing the saddle bracket in a selected position on the I-beam. The way the Spanco gantries perform this holding function is by having a bolt or pin inserted through aligned holes in the saddle bracket and I-beam. This type of securement is not being performed in substantially the same way as plaintiff's patented method of securing the legs (and struts) by using a set screw or other clamping means.

First, as noted, the bolt or pin arrangement requires properly aligned holes through the saddle structure and I-beam which, to some extent, could reduce the strength of the I-beam. This arrangement also acts as a limit upon the number of positions in which the described structures may be positioned during operation of the Spanco gantry. Also, mere frictional engagement using a set screw is obviously less secure than using a metal bolt or pin which goes through the saddle structure and I-beam, and is separately pinned in place. It requires no metallurgical tests to conclude that the force to dislodge or shear the hitch pin, is many times that required to overcome the friction created by the set screws used in the Wallace gantry. Therefore, we conclude that the Spanco gantries are safer than the claimed gantries since they are less likely to allow the saddle structure, legs and struts, to slide along the I-beam during operation. Further, the Wallace and Spanco gantries do not achieve substantially the same result because the claimed clamping means in the Wallace gantry allows the legs to be secured at any position on an I-beam without any perforations, making the claimed gantry significantly more adaptable to its operating environment. Therefore, we find that with respect to the clamping means, both perform substantially the same function, but do not perform that function in substantially the same way to achieve substantially the same result. Accordingly, we further find that the Spanco gantry does not infringe this language in claim 11 under the doctrine of equivalents.

We next will consider the coupling means described in claim 11. We have interpreted the coupling means of claim 11 to require pivotation of the legs longitudinally of the I-beam so that they can have outward splay in either inboard or outboard configurations. As we have previously found, there is simply no means in any of the accused devices to permit the legs to longitudinally

pivot so that the legs can have outward splay in either the inboard or outboard configurations. Therefore, we also conclude that the coupling means in claim 11 cannot be infringed by any of the accused gantries under the doctrine of equivalents.

As to the clamping means of claim 11, the doctrine of equivalents analysis of the clamping means of claim 1 applies in the same manner to the clamping means of claim 11. (As we have noted, however, the Motivation and MHS gantries do have the disputed clamping means.) The accused Spanco gantry and the claimed gantry do not perform the clamping function in substantially the same way to achieve substantially the same result. Consequently, we hold that the Spanco gantry does not infringe the clamping means in claim 11 of the patent-in-suit under the doctrine of equivalents.[20]

▬ Further, Wallace contends that the hypothetical claims support its argument that the accused Spanco gantry literally infringes the claims of the patent-in-suit. However, we find that this contention is also without merit. There is not literal infringement by the Spanco gantries because the hypothetical claims' clamping means are the same as the clamping means of claims 1 and 11 which require some type of external clamping means such as set screws. As to the coupling means of the hypothetical claims, Wallace has recited the coupling means so that they only require pivoting laterally of the beam, ignoring the longitudinal pivoting requirement of claim 11. If claim 11 was not interpreted to require longitudinal pivoting and adjustability of splay, the hypothetical claims would literally infringe the Motivation and MHS gantries and not read on the prior art. However, we are convinced that these hypothetical claims put forward by Wallace, in effect, amount to a redrafting of the claims to avoid the requirement for

---

**20.** Defendants also maintain that the prior art precludes infringement under the doctrine of equivalents. Although we need not over-articulate our determination of this issue in view of our above determinations, we simply note our disagreement with this contention. No prior art

of record discloses rod-like mounting assemblies in combination with a saddle structure for securing a single I-beam which all of the accused gantries possess. Accordingly, it seems apparent that the accused gantries do not practice what was revealed in the prior art.

longitudinal pivoting and, concomitantly, the adjustability for outward splay. This we may not permit. *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1564 (Fed.Cir.1990). Obviously, the hypothetical claims which plaintiff submitted might be useful if we interpreted the claims as Wallace urges. However, we have interpreted the claims to have different limitations than the hypothetical claims. Thus, essentially, they are irrelevant to our determination of infringement under the doctrine of equivalents.[21]

 It is important for courts to limit themselves to interpretation of the claims and not alter what the patentee has chosen to claim as his or her invention. *Intervet Am., Inc. v. Kee–Vet Labs. Inc.*, 887 F.2d 1050, 1053 (Fed.Cir.1989). The prior art did not impose a barrier to drafting claims which would literally read on the accused devices for this or other disputed elements in the claims. However, "[n]o matter how great the temptation of fairness of policy making, courts do not rework claims. They only interpret them." *Id.* at 1053, quoting *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 395–96

(1967). In the present case, it may be argued that an equitable result would require that the plaintiff be compensated for the defendants' use and manufacture of gantries which only slightly differ from the gantries claimed in plaintiff's patent. However, we are satisfied from the evidence presented that defendants successfully designed their gantries so that they would not read on the claimed gantries. Accordingly, a correct legal conclusion requires, and defendants are entitled to, a finding that the accused gantries' adjustable coupling means must have splay for there to be a valid claim of infringement of claim 1 of the Wallace patent.

## CONCLUSION

For the foregoing reasons, this court finds that Wallace has failed to establish by a preponderance of the evidence that the Wallace patent covers the Spanco, Motivation, or MHS gantries used by the United States. Judgment is therefore awarded to the defendants. No costs.

IT IS SO ORDERED.

---

21. The court has attempted to address all of plaintiff's contentions in support of its complaint. However, if the court, through inadvertence, has failed to specifically consider any such contentions in its above analysis, we find that those contentions are without merit for the reasons assigned by defendants.

510

Fig.1.

Fig.2.

Fig.3.

Fig.4.

Fig.5.

Fig.6.

Fig. 7.

Fig. 8.

Fig. 9.

Fig. 10.

Fig. 11.

Fig. 12.

Fig. 19.

Fig. 20.

Fig. 13.

Fig. 14.

Fig. 15.

Fig. 16.

Fig. 17.

Fig. 18.

# APPENDIX B

APPENDIX C

ALSO A PHYSICAL
EXHIBIT

DTX - 110

Jan. 20, 1970 J. A. GIBBINS ET AL 3,490,385
 GANTRY WITH ADJUSTABLE SPAN

Filed April 25, 1968 2 Sheets-Sheet 1

*Fig. 1*

*Fig. 2*

INVENTORS

JOSEPH A. GIBBINS
BERNARD E. WALLACE

BY

*Cameron Kerkam & Sutton*
ATTORNEYS

PLAINTIFF'S
EXHIBIT

APPENDIX D

1. (Amended) In a load-handling gantry, a single, unitary, bridging beam in combination with leg, brace, and *mounting* components so supporting said beam as to provide adjustment of gantry span, height, and spread, and use of the gantry in a number of *leg and brace* configurations [including inboard, outboard, and combination leg bracing], said components comprising:

legs arranged in pairs with the legs of each pair spanning the beam, and extending downwardly and diverging laterally of the beam;

a bracing *strut* associated with, and disposed to brace, each leg;

a pair of *rod-like* mounting assemblies *each* supported *directly* upon said *unitary bridging* beam, [and] movable along the beam to *selected positions to* vary the span between said assemblies, *and including clamping means frictionally securing said assemblies in said positions;*

and means for coupling upper portions of the legs of each pair, and of the bracing struts for *said legs,* [each leg,] to a corresponding one of said assemblies, *and establishing, between the coupled upper portions of each leg and its strut, a distance which is substantially fixed, said means for coupling also including apparatus* [and for] coupling a lower portion of each bracing strut to an intermediate portion of its corresponding leg, in a position in which each strut extends upwardly and away from its leg, said mounting assemblies and coupling means being so configured, and disposed with respect to each other and to said beam, as to afford lateral clearance between the beam, legs, and struts sufficient to permit location of said assemblies, with their coupled legs and struts, at various positions along the length of said beam, and said coupling means further being adjustable, *while substantially maintaining said fixed distance,* to accommodate arrangement of the bracing struts for the legs of both pairs *in configuration* either inboard or outboard of the legs thereof, or in configuration in which the bracing struts of one leg pair are arranged inboard and the bracing struts of the other leg pair are arranged outboard.

12. (Amended) [1] In a load-handling gantry, a *single* [main] generally-horizontal beam having an upright web and lateral flanging extending lengthwise thereof, pairs of supporting legs, normally spaced-apart lengthwise of the beam, the legs of each pair diverging downwardly when in use *and clearing the beam with freedom for sliding motion therealong,* mounting means for the legs *including saddle structure spanning the width of the flanging in slidable engagement therewith* [slidable engageable with flanging of the beam] and configured to *embrace said flanging and* be externally clamped *thereon* [upon the flanging] at various selectable stations by frictional engagement therewith, and adapted to support the beam form the legs, and *means* pivot*ally associating* [means between] the upper ends of the legs *with* [and] said mounting means *and* providing *a first* leg pivot *axis* [axes] extending lengthwise of the beam, [so as] to accommodate variable divergent spread of the legs[,] with lateral clearance between legs and beam, *and a second leg pivot axis extending in the direction of the width of the beam, and providing for adjustment in the angle of the leg with respect to the length of the beam.*

---

**1.** Amended claim 12 is application claim 12 and not the claim 12 which has been alleged to be infringed. It is reproduced to illustrate what the PTO did not consider allowable subject matter.